Gregory SOLOMON, Patricia Beckwith, Raleigh Brinson, and Earl Jennings, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

LIBERTY COUNTY, FLORIDA, Gene Free, Chairman, Commissioner, Joe Burke, Commissioner, James E. Johnson, Commissioner, J.L. Johnson, Commissioner, John T. Sanders, Commissioner, their successors and agents, all in their official capacities, Defendants–Appellees.

Gregory SOLOMON, Patricia Beckwith, Raleigh Brinson, and Earl Jennings, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

LIBERTY COUNTY SCHOOL BOARD, FLORIDA, Ras Hill, Chairman, Joseph Combs, Tommy Duggar, W.L. Potter, Herbert Whittaker, members of the Liberty County School Board, their successors and agents, all in their official capacities, Defendants–Appellees.

No. 87–3406.

United States Court of Appeals, Eleventh Circuit.

April 5, 1990.

David M. Lipman, Lipman & Weisberg, Miami, Fla., for plaintiffs-appellants.

Katherine Inglis Butler, University of South Carolina College of Law, Columbia, S.C., for defendants-appellees.

Before TJOFLAT, Chief Judge, FAY, VANCE*, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON, and COX, Circuit Judges, and HILL**, Senior Circuit Judge.

PER CURIAM:

We unanimously vacate the district court's judgment and remand the case for further proceedings in accordance with the Supreme Court's pronouncement in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). We hold, as a matter of law, that the appellants have satisfied the three *Gingles* factors, *see post* at 1037 (Tjoflat, C.J., specially concurring),

1017 (Kravitch, J., specially concurring), but we are divided on the legal effect of proving those factors. Because we are divided in our interpretation of *Gingles* and section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1982), we do not specifically direct the district court on how to proceed on remand. Rather, we instruct the district court to proceed in accordance with *Gingles*, giving due consideration to the views expressed in Chief Judge Tjoflat's and Judge Kravitch's specially concurring opinions. This case is VACATED and REMANDED for further proceedings.

IT IS SO ORDERED.

KRAVITCH, Circuit Judge, specially concurring, in which JOHNSON, HATCHETT, ANDERSON and CLARK, Circuit Judges, join:

Appellants brought these cases alleging that the at-large method of electing county commissioners and school board members in Liberty County, Florida denies black voters a fair opportunity to participate in the political process and to elect candidates of their choice. This court granted appellants' petition for rehearing in banc to clarify the plaintiff's burden of proof in a claim under section 2 of the Voting Rights Act of 1965, 42 U.S.C. §§ 1971, 1973 to 1973bb–1 (1982).

## I. BACKGROUND

Both the county commission and the school board in Liberty County, Florida consist of five members who serve staggered four-year terms. Fla. Const. Art. VIII, § 1(e) (county commission); Fla.Stat. § 100.041(3) (1987) (school board). The county is divided into five districts; candidates for the commission and the school board run from the district in which they live. Fla. Const. Art. VIII, § 1(e) (commission); Fla.Stat. § 124.01 (1987) (commission); *id.* § 230.061 (school board). In both

* Honorable Robert S. Vance, Circuit Judge, was a member of the en banc court which heard oral argument, but due to his death on December 16, 1989, did not participate in the disposition of this case.

** Honorable James C. Hill, Senior Circuit Judge, has elected to participate in the consideration and disposition of this case. *See* 28 U.S.C. § 46(c).

the primary and general elections, the entire county electorate votes for one candidate from each residence district. *Id.* § 100.041(2) (commission); *Id.* §§ 230.-08–.10 (school board). A candidate must receive a majority of the countywide vote to be selected as his party's nominee in the primary election. If no candidate receives a majority of the vote in the primary, a run-off primary election is held. *See* §§ 100.061, 100.091. In the general election, candidates must obtain a plurality of the countywide vote to win election. *Id.* §§ 100.181, 230.10.

Blacks comprise eleven percent of the population of Liberty County. Under the present residency district lines, blacks comprise 49 percent of the total population of District 1, and 51 percent of the total population of voting age in that district. There have been four black candidacies for elected countywide offices in Liberty County: three for the school board and one for the county commission. All of the black candidates have been unsuccessful.

Appellants seek injunctive relief, contending that the county should be divided into five districts, each of which would elect a single member to the commission and to the school board. The new geographical division would create a district with a black majority. The district court ruled in favor of appellees, finding that black voters exercise more political influence under the current system than they would under any single-member district plan. *Solomon v. Liberty County, Florida,* Nos. TCA 85–7009–MMP & TCA 85–7010–MMP, slip op. (N.D.Fla.1987). On appeal, a panel of this court vacated the judgments of the district court and remanded for further proceedings on the ground that the district court analyzed the evidence under an erroneous legal standard. *Solomon v. Liberty County, Fla.,* 865 F.2d 1566, 1573 (11th Cir.1988), *vacated,* 873 F.2d 248 (1989).

## II. SECTION 2 OF THE VOTING RIGHTS ACT

The proof required to establish a claim for voting discrimination has been changed twice since the Voting Rights Act was passed in 1965.[1] Until 1980, voting discrimination cases were governed by the "results test." *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872–73, 29 L.Ed.2d 363 (1971); *White v. Regester,* 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen,* 485 F.2d 1297, 1304–05 (5th Cir.1973), *aff'd on other grounds sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Under this test, plaintiffs could prevail by showing that, under the totality of the circumstances, the challenged electoral procedure had the result of denying a minority group equal opportunity to participate in the political process. *Zimmer* identified numerous factors that would influence a finding of exclusionary results. 485 F.2d at 1305. Plaintiffs were not required to demonstrate that lawmakers had acted intentionally to exclude minorities.

Then, in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court renounced the results test. Although there was no majority opinion in *Bolden,* at least five justices took the position that discriminatory purpose was a necessary element of a claim for vote dilution. In order to establish a violation of either section 2 of the Voting Rights Act of 1965 or of the Fourteenth or Fifteenth Amendments, plaintiffs were required to prove that officials adopted or maintained a challenged electoral mechanism with the intent to discriminate against minority voters. *Zimmer,* a plurality of the Court explained, was "decided upon the misunderstanding that it is not necessary to show a discriminatory purpose in order to prove a violation of the Equal Protection Clause—that proof of a discriminatory effect is sufficient." *Bolden,* 446 U.S. at 71, 100 S.Ct. at 1501–02. The plurality said that henceforth a

---

**1.** This issue has occasioned a great deal of scholarly comment. *See, e.g.,* McDonald, *The Quiet Revolution in Minority Voting Rights,* 42 Vand.L.Rev. 1249 (1989); Abrams, *"Raising Politics Up": Minority Political Participation and Section 2 of the Voting Rights Act,* 63 N.Y.U. L.Rev. 449 (1988).

necessary ingredient of a successful claim of minority vote dilution was evidence that officials " 'conceived or operated [a] purposeful devic[e] to further racial discrimination.' " *Id.* at 70, 100 S.Ct. at 1501 (quoting *Whitcomb,* 403 U.S. at 149, 91 S.Ct. at 1872).

In 1982, largely in response to the Court's decision in *Bolden, see* S.Rep. No. 417, 97th Cong., 2d Sess. 24–39, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177 (hereinafter S.Rep.), Congress amended section 2 of the Voting Rights Act to restore the legal standard that governed voting discrimination cases prior to *Bolden.*[2] S.Rep. at 27. In adopting the results test, Congress sought to remedy several problems engendered by the subjective intent test. First, the intent test "asks the wrong question," *id.* at 36, by probing the racial motives of lawmakers rather than determining whether minorities can participate equally in the political system. "If [minorities] are denied a fair opportunity to participate ... the system should be changed, regardless of what may or may not be provable about events which took place decades ago." *Id.* Second, Congress found the intent test unnecessarily divisive because it requires charges of racism on the part of officials or entire communities, a consequence which the results test avoids. *Id.* Finally, the intent test places too high an evidentiary burden on plaintiffs, often involving attempts to reconstruct the motives of persons long dead from incomplete or even non-existent official records. *Id.* at 36–37. *See also* Note, *To Infer or Not to Infer a Discriminatory Purpose: Rethinking Equal Protection*

*Doctrine,* 61 N.Y.U.L.Rev. 334, 343–44 (1986) (summarizing the difficulties of proving discriminatory intent).

Congress found that the intent test diminished the effectiveness of the Voting Rights Act as a means of fighting voting discrimination. Explaining its rejection of *Bolden, see* S.Rep. at 31–34, 37–39, the Committee on the Judiciary noted that "[i]t was only after the adoption of the results test and its application by the lower federal courts that minority voters in many jurisdictions finally began to emerge from virtual exclusion from the electoral process. We are acting to restore the opportunity for further progress." *Id.* at 31, 1982 U.S. Code Cong. & Admin.News at 209.

The Senate Report set forth several "factors" derived from *White, Zimmer,* and other voting rights cases, a showing of which will typically establish a section 2 violation:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

---

2. Section 2, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally

open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. at 28–29, 1982 U.S.Code Cong. & Admin.News at 206–207 (footnotes omitted). The report listed two additional circumstances that might be probative of a violation:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 29, 1982 U.S.Code Cong. & Admin. News at 207 (footnotes omitted). The Report stressed that plaintiffs are not required to prove any particular number of the listed factors, and that other factors not listed might be probative in some cases, because the results test examines the totality of the circumstances. *Id.* at 29 & n. 118; *Armour v. Ohio,* 895 F.2d 1078, 1084 (6th Cir.1990).

*Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), presented the first opportunity for the Supreme Court to interpret the effect of the 1982 amendment on the plaintiff's burden under section 2. Addressing the factors enumerated in the Senate Report, the Court recognized that some or all of the factors might be relevant, but emphasized that the existence of racial bloc voting was the essence of a successful vote dilution claim. *Id.* at 46, 48–49, 106 S.Ct. at 2764, 2765–66. To prevail under section 2, a plaintiff challenging a multidistrict plan must fulfill three requirements:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ... —usually to defeat the minority's preferred candidate.

*Id.* at 50–51, 106 S.Ct. at 2766–67. *See also Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1550 (11th Cir.1987) (*Gingles* "established a new three-part test for analyzing minority vote dilution claims under Section 2 of the Voting Rights Act.").

*Gingles* made clear that the 1982 amendment to section 2 obviated the need for plaintiffs to prove that the contested electoral mechanism was adopted or maintained with the intent to discriminate against minority voters. *Gingles,* 478 U.S. at 43–44, 106 S.Ct. at 2762–63. The only question, the Court explained, "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Id.* at 44, 106 S.Ct. at 2762–63 (quoting S.Rep. at 28). Thus, if plaintiffs are able to establish that the challenged electoral practice has the effect of diluting minority voting strength, defendants cannot argue as an affirmative defense that the practice was adopted or maintained for a nondiscriminatory reason.[3]

**3.** Chief Judge Tjoflat argues that even if a plaintiff proves the three *Gingles* factors, the defendant may defeat the plaintiff's claim by demonstrating that the community is not driven by racial bias. Chief Judge Tjoflat has canvassed the pertinent cases and legislative history and provided his view of how § 2, as amended, should be interpreted. The Supreme Court also

Recently, the Eighth Circuit in *Whitfield v. Democratic Party of Arkansas* similarly concluded that the legislative history and text of section two, and the Supreme Court's decision in *Gingles* repudiate the injection of discriminatory intent into a section two claim. 890 F.2d 1423, 1429–30 (8th Cir.1989); *see also Armour*, 895 F.2d at 1083 (relying on legislative history to reject intent test for section two claims). "While proof of [discriminatory] intent may be used to show a violation of section 2, such proof is not required of a plaintiff under the statutory language." 890 F.2d at 1429 (citations omitted).

## III. APPLYING THE *GINGLES* TEST

The district court failed to pay sufficient deference to the three part vote dilution test laid out by the Supreme Court in *Gingles* and recognized by this court in *Carrollton*.[4] Although a district court may consider the totality of the circumstances, those circumstances must be examined for the light they shed on the existence of the three core *Gingles* factors. The Supreme Court made clear that the three part test of *Gingles* is a threshold that a plaintiff must meet in order to maintain a section 2 claim; the Court recognized, however, that "the other factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists— for example antibullet voting laws and majority vote requirements, are supportive of, but *not essential to*, a minority voter's claim." 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15 (emphasis in original). As is evident in my discussion below, proof of the three *Gingles* factors is both necessary and, in this case, sufficient for a section 2 vote dilution claim.[5] Applying the *Gingles* test to the uncontroverted statistical evidence below, it is apparent that the appellants met each of the three *Gingles* requirements as a matter of law.[6]

had the benefit of the prior cases and the legislative history, however, and in our view interpreted section two to remove the intent and bias considerations that Congress objected to in *Bolden*. Chief Judge Tjoflat cites *White v. Regester* for the proposition that the Court "expressly retained the requirement, under the fourteenth amendment, of proving invidious discrimination." The Court glossed invidious use, in the context of multi-member districts, stating that to sustain such a claim the plaintiff has the burden of producing evidence "to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. at 766, 93 S.Ct. at 2339.

Permitting a defendant the affirmative defense of showing the absence of community racial bias would involve litigating the issue of whether or not the community as a whole was motivated by racism, a divisive inquiry that Congress sought to avoid by instituting the results test. The Committee quoted the testimony it found persuasive that such an inquiry "can only be divisive, threatening to destroy any existing racial progress in a community." S.Rep. at 36, 1982 U.S.Code Cong. & Admin.News at 214.

Chief Judge Tjoflat's analysis takes a tack similar to that of Justice O'Connor's concurring opinion in *Gingles*. It bears noting that her opinion clearly posed the alternative now urged by Chief Judge Tjoflat, yet failed to obtain the support of a majority of the Court.

The "results" test as developed in *Gingles* requires the showing of racial bloc voting. Although I do not believe that amended § 2 introduced the concept of racial bias, I note that a division on racial lines, as exemplified in voting patterns, is striking evidence of a racially divided community, and, I submit, a fairly persuasive indicator of a community driven by racial bias.

While *Gingles* made clear that proof of the three core factors can be sufficient to establish a § 2 vote dilution claim, plaintiffs in this case also adduced strong evidence establishing the other supportive factors. On the totality of the evidence in the instant record, plaintiffs have clearly established their claim.

4. The district court did not have the benefit of the *Carrollton* decision when it issued its ruling.

5. The *Gingles* test applies to those vote dilution cases in which the plaintiff relies solely on the disparate impact of an election scheme to establish a violation of the Voting Rights Act. In cases where a plaintiff can show that an electoral scheme was purposefully adopted to weaken a minority group's political influence, a less stringent test of discriminatory impact presumably would apply.

6. In concluding that the *Gingles* test has been met as a matter of law, I am mindful that the

## A.

The first *Gingles* test requires appellants to show that blacks in Liberty County constitute a group sufficiently large and geographically compact that they would have the potential to elect their own representatives under a single-member district scheme. *Gingles*, 478 U.S. at 50 & n. 17, 106 S.Ct. at 2766 & n. 17. If a minority group is too small or dispersed to elect its own representatives under any reasonable alternative plan, then an at-large system cannot be responsible for that group's inability to elect its candidates.

Although blacks comprise only 11% of Liberty County's total population, the undisputed demographic evidence indicates that the black population is concentrated in the northwest region of Liberty County. The current residency districts already divide the county into five equally populous regions. These district lines could thus be used to hold single-member district elections. In District 1, blacks represent 49% of the total population, 51% of the voting

age population, and 46% of the registered voting age population.

The district court incorrectly relied in part on the registered voter statistic and ignored the proportion of voting age residents who are black. An at-large election system that frustrates the ability of minorities to elect their chosen representatives will naturally reduce the incentive for blacks to register to vote. The district court thus relied on an indicator which might reward and perpetuate a history of disenfranchising blacks.

The racial composition of voting age residents is one accurate measure of the potential for a minority group to elect their own representatives. Here, the undisputed evidence shows that blacks would constitute a majority of District 1's voting age population. That conclusively establishes that blacks are a sufficiently large and geographically compact group in Liberty County to be eligible for relief under the Voting Rights Act.[7]

---

ultimate determination of vote dilution is a question of fact to be resolved under the totality of the circumstances. *Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781. An appellate court may not set aside a finding of fact unless it is clearly erroneous, giving due regard to the district court's opportunity to judge the credibility of witnesses. Fed.R.Civ.P. 52(a). However, as the Supreme Court noted in *Gingles*, Congress provided legal standards which a court must apply to the facts in order to determine whether § 2 has been violated. 478 U.S. at 79, 106 S.Ct. at 2781. In reviewing the trial court's application of those standards, appellate courts are not limited by the clearly erroneous standard of review. "Rule 52(a) 'does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.'" *Id.* (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501, 104 S.Ct.1949, 1960, 80 L.Ed.2d 502 (1984)).

The three *Gingles* requirements present mixed questions of law and fact. Initially, the district court must make findings of fact concerning the polity's demographics and actual voting patterns in particular elections. The subsequent determination of the legal inferences to be drawn from those facts, however, involve questions of law and the application of legal standards. *See Gingles*, 478 U.S. at 55–58, 106 S.Ct. at 2768–70 (discussing the standards for "legally significant" racial bloc voting); 9 C. Wright & A.

Miller, *Federal Practice and Procedure* § 2589 (1971).

Here, the appellants presented uncontested statistical evidence that went to the heart of each of the three *Gingles* requirements. Although the district court raised its own objections to the statistical evidence, these concerns were not based on an evaluation of competing testimony or other evidence in the record. The district court simply found that the evidence was "statistically significant" but not "legally significant." Slip op. at 6. Almost by definition, this conclusion involves questions of law and must be reviewed de novo.

Seemingly as an afterthought, the district court also found that the statistical evidence could not be relied on to reflect real voting behavior in Liberty County. Slip op. at 12. This finding is not supported by the evidence and appears to contradict the court's earlier conclusion that the evidence was statistically significant. Having reviewed the record and the district court's criticisms, I conclude that rejection of appellants' statistical evidence was clearly erroneous.

7. This holding should not be read to imply an opposite result where blacks do not constitute an outright majority of the voting age population in any district. So long as the potential exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act.

## B.

The second *Gingles* test requires proof that blacks in Liberty County are politically cohesive. An at-large system cannot be responsible for submerging a minority group's political interests if that group does not have common interests evidenced by a pattern of bloc voting. *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67. Plaintiffs may establish minority bloc voting by showing that a significant number of minority group members usually vote for the same candidates. *Id.* at 56, 106 S.Ct. at 2769.

Ordinarily, direct evidence of minority voting patterns is unattainable, since ballots do not indicate a voter's race. Instead, appellants presented statistical evidence prepared by Professor Douglas St. Angelo

of Florida State University. One technique used by Professor St. Angelo was to estimate the number of white votes cast for a candidate based on the election results in virtually all-white precincts. From this estimate, Professor St. Angelo calculated the number of black votes cast for the candidate by subtracting the estimated number of white votes from the overall total. Professor St. Angelo applied this analysis to the six countywide elections involving black candidates and found that, excluding one candidacy, blacks received between 75 and 100 percent of the black vote.[8]

Another technique used by Professor St. Angelo was to perform regression analyses showing the correlation between the percentage of registered black voters in a pre-

*Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. at 2766. In some cases, blacks may constitute a majority of the overall population and may be expected to comprise a majority of the voting age population in the near future. In other cases, blacks may be so close to fifty percent that they would have a realistic chance of electing a representative. Finally, it may be that the addition of only one or two representatives to the deliberative body would make it possible for a minority group to attain a voice. The present case does

not involve these more difficult situations, however, and so I leave their consideration for another time.

8. Professor St. Angelo's results are summarized in the following table. There is reason to believe that elections 2 and 3 below are poor indicators of black political cohesiveness, since the district court found that the white establishment in Liberty County backed Earl Jennings' 1980 school board candidacy.

### ELECTIONS INVOLVING BLACK CANDIDATES FOR COUNTY OFFICE

| Election | Estimated Percentage Vote Received from White Voters | Resulting Percentage Vote Received from Black Voters |
|---|---|---|
| 1. May 7, 1968 School Board (1st Primary) Charles Berrium | 2.8% | 100.0% |
| 2. September 9, 1980 School Board (1st Primary) Earl Jennings | 17.0% | 44.7% |
| 3. October 7, 1980 School Board (Primary Runoff) Earl Jennings | 40.5% | 64.7% |
| 4. September 4, 1984 County Commission (1st Primary) Gregory Solomon | 18.8% | 74.7% |
| 5. October 2, 1984 County Commission (Primary Runoff) Gregory Solomon | 32.9% | 90.0% |
| 6. September 4, 1984 School Board (1st Primary) Earl Jennings | 14.5% | 78.2% |

cinct and the percentage of the vote a candidate received. Professor St. Angelo performed these analyses on three types of elections: elections involving black candidates for county office, elections involving black candidates for national office, and elections involving racial issues or themes. In fourteen of sixteen elections, there was an exceptionally strong positive correlation between the number of registered black voters and the number of votes received by the candidate expected to receive black support.[9]

In *Gingles* the Supreme Court found that black support for black candidates was "overwhelming" based on evidence that was substantially similar to the evidence in this case.[10] 478 U.S. at 59, 106 S.Ct. at 2770–71. I conclude that appellants' uncontroverted statistical evidence was sufficient to establish black political cohesiveness as a matter of law.

## C.

Finally, the third *Gingles* test requires appellants to demonstrate that whites in Liberty County vote sufficiently as a bloc that they usually are able to defeat the minority's preferred candidate. 478 U.S. at 56, 106 S.Ct. at 2769.

Appellants presented strongly persuasive evidence of white vote polarization. It was

9. Regression analyses produce a number known as an "r" coefficient which expresses the degree of correlation between two variables. The "r" values range from 0, which indicates no relationship, to 1, which indicates a perfectly consistent relationship. Values above 0.3 may be considered statistically significant, while values above 0.8 reflect an exceptionally strong correlation. Professor St. Angelo's findings are set forth in the table below.

### ELECTIONS INVOLVING BLACK CANDIDATES FOR COUNTY OFFICE

| Election | (Percent Vote Received by Identified Candidates Per Precinct/Percent Black Voters Per Precinct) |
|---|---|
| 1. May 7, 1968 School Board (1st Primary) Charles Berrium | .996 |
| 2. September 9, 1980 School Board (1st Primary) Earl Jennings | .578 |
| 3. October 7, 1980 School Board (Primary Runoff) Earl Jennings | .280 |
| 4. September 4, 1984 County Commission (1st Primary) Gregory Solomon | .989 |
| 5. October 2, 1984 County Commission (Primary Runoff) Gregory Solomon | .962 |
| 6. September 4, 1984 School Board (1st Primary) Earl Jennings | .919 |

### ELECTIONS INVOLVING BLACK CANDIDATES FOR NATIONAL OFFICE

| | |
|---|---|
| 7. September 1970 U.S. Senate Democratic Primary Hastings | .917 |
| 8. March 1972 President Democratic Primary Chisholm | .998 |
| 9. March 1984 President Democratic Primary Jackson | .983 |

### ELECTIONS INVOLVING RACIAL ISSUES OR THEMES

| | |
|---|---|
| 10. November 1968 President Humphrey (vs. Nixon and Wallace) | .972 |
| 11. November 1970 Governor Askew (vs. Kirk) | .847 |
| 12. March 1972 Straw Ballot In Favor of Busing | .901 |
| 13. November 1972 President McGovern (vs. Nixon) | .984 |
| 14. November 1976 President Carter (vs. Ford) | .876 |
| 15. November 1980 President Carter (vs. Reagan) | .935 |
| 16. November 1984 President Mondale (vs. Reagan) | .961 |

10. In *Gingles*, black support for black candidates ranged from 71% to 92% in all but 5 of 16 primary elections, and from 87% to 96% in the general elections. 478 U.S. at 59, 106 S.Ct. at 2770.

undisputed that the average white cross-over vote was twenty-one percent in the six countywide elections that involved black candidates.[11] This means that on average nearly eighty per cent of whites in Liberty County have voted as a bloc in elections involving black candidates for county office. The district court correctly noted that the white vote in Liberty County is not as polarized as the black vote. However, because blacks comprise only 11% of the County's population, even a moderate degree of white voter polarization is sufficient to defeat the candidates preferred by black voters.

Not a single black has ever been elected in Liberty County.[12] The most cross-over support any black candidate has ever received is 40.5% of the white vote.[13] That candidate would have been defeated even if he had received 100% of the black vote.[14] Thus, black voters have never had an opportunity to elect a black representative, despite their manifest preference for those black candidates that have presented themselves.[15] Six futile elections is enough. Appellants' evidence was sufficient as a matter of law to establish that white voting in Liberty County is racially polarized to the extent that blacks are unable to elect the candidates of their choice.[16]

In conclusion, the district court erred in failing correctly to apply the *Gingles* test. Having reviewed the uncontroverted evidence below, I conclude that appellants have met all three *Gingles* requirements. This is all the Supreme Court requires, and I may require no more.

TJOFLAT, Chief Judge, specially concurring, in which FAY, EDMONDSON, and COX, Circuit Judges, and HILL, Senior Circuit Judge, join:

I concur in the judgment of the court. I do not agree, however, with Judge Kravitch, who would hold as a matter of law that the appellants have prevailed. I adhere to the views expressed by the panel in this case, *see Solomon v. Liberty County*, 865 F.2d 1566 (11th Cir.1988), *vacated*, 873 F.2d 248 (11th Cir.1989) (en banc), and would remand this case to the district court for further proceedings consistent with that opinion.

In her concurring opinion in *Thornburg v. Gingles*, 478 U.S. 30, 84, 106 S.Ct. 2752, 2784 (1986), Justice O'Connor stated that interpreting section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1982),[1] "is not an

---

**11.** See the column in note 8, *supra*, under the heading "Estimated Percentage Vote Received from White Voters."

**12.** Although the uniform inability of black candidates to win office buttresses the plaintiffs' claim, I do not mean to suggest that the success of black candidates, without more, would compel a finding in favor of defendants. As this court said in *Carrollton*,

[R]acial bloc voting does not depend on the success or defeat of a particular candidate. Under Section 2, it is the status of the candidate as the chosen representative of a particular group, not the race of the candidate that is important.

829 F.2d at 1557 (interpreting *Gingles*).

**13.** In *Gingles*, white support for black candidates ranged from 8% to 50% in primary elections and from 28% to 49% in general elections. 478 U.S. at 59, 106 S.Ct. at 2771.

**14.** Assuming equal voter turnout and an 89:11 ratio of white to black registered voters, that candidate could only have received 47% of the vote (.89 × 40.5% plus .11 × 100%).

**15.** *See supra* § III.B & notes 8–9.

**16.** Chief Judge Tjoflat overstates the case when he claims that my interpretation of *Gingles* results in a right to proportional representation. To the contrary, it provides at most the opportunity for minorities to elect representatives of their choice. Should they choose not to exercise that opportunity, they would have no further redress. That a certain group does not succeed in the electoral arena when it has a fair opportunity to do so is not a problem that may be remedied under § 2.

**1.** Section 2 provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not

easy task." I fully agree. Because the amendment reflects a compromise between two very different views in the Congress that passed the 1982 amendment to section 2, much of that section's language seems inherently inconsistent and, at times, virtually meaningless. Nevertheless, we have available to us a substantial legislative history and a Supreme Court opinion interpreting section 2 to guide our analysis. In my view, Judge Kravitch, in her special concurrence (the Kravitch concurrence), misinterprets those sources. I write to explain why I believe Judge Kravitch's position to be incorrect and what I consider to be the correct interpretation of section 2 in the vote dilution context.

The Kravitch concurrence is somewhat ambiguous on certain key issues. At times, it seems to have redefined the totality-of-the-circumstances test to include only the three, mechanical factors articulated in *Gingles, see ante* at 1021: (1) the size and compactness of the minority population; (2) the political cohesiveness of the minority population; and (3) the voting tendencies of the white majority. Section 2, its legislative history, and *Gingles* itself all call for a more searching and flexible inquiry into the totality of the circumstances surrounding the voting system, and there is a very important reason for that flexibility. If Judge Kravitch is strictly limiting her inquiry to the three *Gingles* factors, she would create a right to proportional representation for all large, compact, and cohesive minority groups—a result explicitly forbidden by section 2.[2]

At other times, however, the Kravitch concurrence seems to say that a section 2 plaintiff does not *necessarily* win by proving the three *Gingles* factors and that the totality of the circumstances is still rele-

vant. *See ante* at 1017–18. With this proposition, I would agree, but I fear that Judge Kravitch has failed to articulate the standard with which she has evaluated the appellants' case. When could a section 2 plaintiff lose even though he has proven the three *Gingles* factors? How did Judge Kravitch decide in this case that the appellants' evidence was sufficient to require judgment in their favor as a matter of law? How may a defendant rebut a section 2 claim when the three *Gingles* factors have been proven? The Kravitch concurrence neglects these important questions, which I attempt to answer below.

In part I of this opinion, I review the judicial and legislative history of the 1982 amendment to section 2 in an attempt to define the balance struck by the compromise legislation that now appears as section 2. I submit that section 2 prohibits those voting systems that have the effect of allowing a community motivated by racial bias to exclude a minority group from participation in the political process. Therefore, if a section 2 defendant can affirmatively show, under the totality of the circumstances, that the community is not motivated by racial bias in its voting, a case of vote dilution has not been made out. In part II, I examine this proposition in light of the Supreme Court's pronouncement in *Gingles* and show that *Gingles* in fact supports this interpretation of section 2. In part III, I summarize my discussion. Finally, in part IV, I explain how the case under consideration should be resolved given a proper interpretation of section 2.

## I.

### A. Judicial Background

Our story begins in 1965, when Congress enacted the Voting Rights Act of 1965,

---

equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provid-*

*ed,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973.

**2.** *See infra* note 13 (discussing why Judge Kravitch's approach results in proportional representation).

Pub.L. No. 89–110, 79 Stat. 437 [hereinafter 1965 Act] (codified as amended at 42 U.S.C. §§ 1971, 1973 to 1973bb–1 (1982)). The 1965 Act was enacted pursuant to the authority granted to Congress by section 2 of the fifteenth amendment to enforce section 1 of the amendment with appropriate legislation. The heart of the 1965 Act was found in sections 4 and 5, which (1) designated certain areas of the country where voting discrimination had been most flagrant, (2) suspended literacy tests and other similar tests in those areas, and (3) prohibited any changes in voting procedures in those areas without first obtaining preclearance from the Attorney General or a declaratory judgment from the United States District Court for the District of Columbia that the new procedure "[did] not have the purpose and [would] not have the effect of denying or abridging the right to vote on account of race or color." *Id.* § 5, 79 Stat. at 439 (codified as amended at 42 U.S.C. § 1973c). Less controversial and, at the time, less important was section 2, which applied to the entire nation and which stated: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." *Id.* § 2, 79 Stat. at 437 (codified as amended at 42 U.S.C. § 1973).

Sections 4 and 5 of the 1965 Act were upheld against constitutional attack in *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). Although the Court there expressed no opinion as to the constitutionality of section 2 of the 1965 Act, it did set out a test to be used in all challenges to legislation enacted pursuant to section 2 of the fifteenth amendment. Quoting *Ex parte Virginia*, 100 U.S. 339, 25 L.Ed. 676 (1879), the Court stated:

> [w]hatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Katzenbach*, 383 U.S. at 327, 86 S.Ct. at 818 (quoting *Ex parte Virginia*, 100 U.S. at 345–46). The Court went on to hold that, while parts of the 1965 Act may have constituted "an uncommon exercise of congressional power," *id.* 334, 86 S.Ct. at 822, all of the challenged sections were appropriate within the meaning of *Ex parte Virginia* and the fifteenth amendment.

### 1. The Genesis of the Intent Test

The next chapter in the story of section 2 begins with *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), in which the Supreme Court began its development of the intent test ultimately announced ten years later in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *Whitcomb* involved a challenge to a multimember-district electoral scheme in Marion County, Indiana. Significantly, the challenge was not based on section 2 of the 1965 Act or on the fifteenth amendment but on the fourteenth amendment. The Court noted that any schemes "conceived or operated as purposeful devices to further racial discrimination" would be struck down under the fourteenth amendment. 403 U.S. at 149, 91 S.Ct. at 1872. It found, however, that the scheme under attack had not been designed to dilute the minority vote. *Id.*, 91 S.Ct. at 1872. The Court then shifted its focus from the intent of the county's legislators to conditions in the voting community as a whole. The Court stated that *invidious discrimination* could not be proved only with evidence of the minority candidates' lack of success. Instead, the Court held, the plaintiffs had to show that the minority population "had less opportunity than did other Marion County residents to participate in the political processes and to elect legislators of their choice." *Id.*, 91 S.Ct. at 1872. To make this showing, the plaintiffs could rely on evidence of certain objective factors, such as evidence of minorities being prohibited from registering to vote,

from choosing a political party, or from being slated by the major parties. *Id.* at 149–50, 91 S.Ct. at 1872.

Because much of this language was incorporated into the 1982 amendment to section 2, we should stop to consider exactly what the Court was saying. Apparently, the Court required proof of invidious discrimination to support a claim under the fourteenth amendment. But the Court seemed to recognize two types of discrimination and two methods of proving it. First, the plaintiff could prove invidious discrimination with proof of the legislators' intent—the intent of either those who designed the scheme or those who maintained it. Second, the plaintiff could prove invidious discrimination with circumstantial evidence of racial bias in all levels of the *voting community.* Although the Court did not expressly recognize that it was talking about racial bias in two different groups, the objective factors articulated by the Court were not relevant only to "official" discrimination; they were relevant to racial bias in the political organizations and all levels of the voting community.[3] Thus, the Court implicitly recognized that two groups were relevant to any inquiry into discrimination in the voting process: the legislators or officials responsible for designing or maintaining the procedure and the voting community as a whole.

The Supreme Court's next important voting rights case was *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). As in *Whitcomb,* the plaintiffs in *White* challenged, under the fourteenth amendment, the multimember-district apportionment plan of certain counties in Texas. In defining the constitutional issue before it, the Court stated that it was required to determine whether the apportionment plan had "been invidiously discriminatory against cognizable racial or ethnic groups in those counties." *Id.* at 756, 93 S.Ct. at 2335. Thus, the Court retained proof of invidious discrimination as a re-

quirement of a successful voting rights or vote dilution case brought under the fourteenth amendment. *See id.* at 764, 93 S.Ct. at 2339.

The Court's opinion in *White* never mentioned that the plaintiffs attempted to prove invidious discrimination with proof of the legislators' subjective intent in designing or maintaining the scheme; we can reasonably assume no such attempt was made. Instead, the plaintiffs appear to have relied solely on circumstantial evidence, and it is the Court's discussion of that evidence that is most relevant today.

The Court began by noting that multimember districts are not unconstitutional per se. *Id.* at 765, 93 S.Ct. at 2339. In a key statement, the Court then defined the essence of a vote dilution claim: "we have entertained claims that multimember districts *are being used invidiously to cancel out or minimize* the voting strength of racial groups." *Id.* (emphasis added) (citing *Whitcomb*). Then, closely tracking the discussion in *Whitcomb,* the Court held that proof of lack of minority success is not sufficient to make out a vote dilution case. With language expressly incorporated into amended section 2, the Court held that

[t]he plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*Id.* at 766, 93 S.Ct. at 2339 (citing *Whitcomb*).

Like the *Whitcomb* Court, the *White* Court then approved several objective factors used by the district court to determine whether the plaintiffs had met their burden of proof. First, the Court noted that the district court properly considered the history of official racial discrimination

---

**3.** *Cf. Zimmer v. McKeithen,* 485 F.2d 1297, 1305 n. 20 (5th Cir.1973) (The *Whitcomb* Court's focus "on the access of minorities to slating procedures in Marion County, Indiana, makes clear that the standards we enunciate today are appli-

cable whether it is a specific law or a custom or practice which causes the diminution of minority voting strength."), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

in Texas. It then approved the district court's consideration of certain rules, such as a majority vote requirement in primaries and "place" rules, that, "neither in themselves improper nor invidious, *enhanced the opportunity for racial discrimination." Id.* at 766, 93 S.Ct. at 2339–40 (emphasis added). Finally, the Court noted that the district court properly took into consideration the domination of the Democratic Party by a primarily white, private organization called the Dallas Committee for Responsible Government. The Supreme Court approved the district court's consideration of the racial campaign tactics used by the Committee to defeat candidates supported by the black community. *Id.* at 767, 93 S.Ct. at 2340. The district court concluded that the minority population had been excluded from the political process in Texas, and, based on the objective factors found by the district court, the Supreme Court affirmed. *Id.*, 93 S.Ct. at 2340.

What exactly did the Supreme Court do in *White?* One commentator has suggested that the meaning of *White* "can be argued interminably." *See* Blumstein, Defining and Proving Race Discrimination: Perspectives on the Purpose Vs. Results Approach from the Voting Rights Act, 69 Va.L.Rev. 633, 670 (1983). I am not so pessimistic. First, we know that the Court expressly retained the requirement, under the fourteenth amendment, of proving invidious discrimination. *See White,* 412 U.S. at 764, 93 S.Ct. at 2339. Second, *White* did not change the *Whitcomb* Court's holding that a vote dilution challenge to a multimember-district scheme would succeed on proof of the legislators' or officials' subjective intent to enact or maintain legislation that would dilute the minority population's voting strength. *See Whitcomb,* 403 U.S. at 149, 91 S.Ct. at 1872. Third, we know that the "invidious discrimination" requirement can also be satisfied with proof that the minority group had less opportunity than did other residents to participate in the political process and to elect legislators of their choice, which in turn can be proven with evidence of certain objective factors. *See White,* 412 U.S. at 766–67, 93 S.Ct. at 2339–40.

This brings us to the question of what type of "invidious discrimination" the objective factors prove. The *White* Court said that a plaintiff succeeds when he can show that the multimember districts *"are being used"* to dilute minority voting strength. *Id.* at 765, 93 S.Ct. at 2339 (emphasis added). *Who* did the Court think would be using the multimember districts to dilute minority voting strength? The Court also noted that certain rules, while "neither in themselves improper nor invidious, *enhanced the opportunity* for racial discrimination." *Id.* at 766, 93 S.Ct. at 2340 (emphasis added). *Whose* opportunity to discriminate did those rules enhance? I submit that the Court was concerned about the interaction between the voting scheme and racial bias in all levels of the voting community. Why else would a private organization's racial campaign tactics be relevant? Why would the Court consider neutral rules that enhance the opportunity to discriminate? If the Court was concerned only with public officials' bias, then it would have looked only to the motive behind enacting and maintaining those rules, not to the opportunity for discrimination that those neutral rules created.

This interpretation of *White* would also explain the Court's statement regarding the Mexican–American population in Bexar County that, "[b]ased on the totality of the circumstances, the District Court evolved its ultimate assessment of the multimember district, *overlaid, as it was, on the cultural and economic realities of the Mexican–American community in Bexar County and its relationship with the rest of the county." Id.* at 769, 93 S.Ct. at 2341 (emphasis added). Professor Casper has argued that this portion of the Court's opinion means that

> [m]ultimember districts ... violate the Equal Protection Clause, not because they overrepresent or underrepresent pure and simple, but because they do that in a context where *all stages of the electoral process* have been effectively closed to identifiable classes of citizens, making the *political establishment* "in-

sufficiently responsive" to (Mexican–American) interests.

Casper, Apportionment and the Right to Vote: Standards of Judicial Scrutiny, 1973 Sup.Ct.Rev. 1, 28 (emphasis added). Clearly then, the objective factors are not relevant only to the narrow issue of legislators' intent; rather, they are indicators of (1) racial bias in the political community as a whole and (2) an interaction between that bias and the challenged scheme.

To summarize, after *Whitcomb* and *White*, a plaintiff could win a voting rights case under the fourteenth amendment only by showing "invidious discrimination," and that showing could be made with evidence of either (1) the legislators' or officials' subjective intent to enact or maintain a discriminatory voting scheme, or (2) objective factors that tend to prove that the minority group has less opportunity to participate in the political process and to elect officials of its choice. And, as I have shown, a minority group has less opportunity to participate in the political process when the voting community is driven by racial bias and the challenged scheme enhances the opportunity to express that bias.

In *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), the former Fifth Circuit interpreted *White* and *Whitcomb*, adding several factors to the growing list of objective factors used to prove lack of access to the political process. Among the factors considered by the *Zimmer* court were (1) the responsiveness of officials to the minority group's needs, (2) the purported state policy behind the scheme, (3) the existence of past discrimination, (4) the existence of large districts, (5) majority vote requirements, (6) anti-single-shot voting provisions, and (7) access to slating processes. *Id.* at 1305.

### 2. *The Bolden Intent Test*

In *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court again addressed a challenge to a multimember-district apportionment scheme, this time brought under the fourteenth and fifteenth amendments as well as section 2 of the 1965 Act. A plurality of the *Bolden* Court first held that, as a matter of statutory construction, section 2 of the 1965 Act simply restated the fifteenth amendment and granted nothing in addition to those rights already granted by the fifteenth amendment. *Id.* at 60–61, 100 S.Ct. at 1496. The plurality then held that "action by a State that is racially neutral on its face violates the Fifteenth Amendment [and, by implication, section 2 of the 1965 Act] only if motivated by a discriminatory purpose." *Id.* at 62, 100 S.Ct. at 1497.

Because the clear purpose of the 1982 amendment to section 2 was to overturn *Bolden*'s intent test, we should be absolutely certain of what the *Bolden* plurality held. The plurality reviewed many cases in the process of distilling the intent test, and in each discussion, it pointed out that proof of *legislative intent* was the gravamen of the complaint. *See id.* at 62–67, 100 S.Ct. at 1497–99. At one point, the plurality stated that "[a] plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial ... discrimination.'" *Id.* at 66, 100 S.Ct. at 1499 (quoting *Whitcomb*). As I note above, this statement in *Whitcomb* was directed at cases in which the plaintiff attempts to prove the legislators' or officials' subjective intent in designing or maintaining the challenged scheme.

As further evidence that the plurality was requiring proof of the legislators' or officials' subjective intent, the Court held that the *Zimmer* factors could not provide "sufficient proof of such a purpose." *Id.* at 73, 100 S.Ct. at 1503. As I explain above, the *Zimmer* factors, or more accurately, the *White–Zimmer* factors, are relevant to a determination of racial bias in the voting community as a whole; thus, the *Bolden* plurality's holding that the *White–Zimmer* factors alone could not support a finding of "purpose" indicates that the Court was requiring proof of the *other* form of invidious discrimination—i.e., racial bias on the part of legislators or

other responsible officials. Stated succinctly, *Bolden* required proof of "what was in the minds of legislators who enacted or retained a voting law alleged to be discriminatory." Parker, The "Results" Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard, 69 Va.L. Rev. 715, 740 (1983).

This, in fact, was the district court's understanding of the Supreme Court's holding in *Bolden* when the case was remanded for further factfinding. In a lengthy opinion, the district court provided a detailed examination into the motives of the legislators who were responsible for devising the City of Mobile's election scheme. *See Bolden v. City of Mobile*, 542 F.Supp. 1050, 1053–68 (S.D.Ala.1982). The district court then held that "invidious racial reasons played a substantial and significant part" in the legislators' motives for designing the at-large election scheme. *Id.* at 1075.

*Bolden*, therefore, stands for two propositions. First, it equates section 2 of the 1965 Act with the fifteenth amendment. Second, it requires, under the fifteenth amendment, that a plaintiff prove discriminatory intent on the part of the legislators who designed or maintained the voting scheme.

### B. Legislative Reaction to *Bolden*

Most of the legal community immediately condemned the *Bolden* decision. *See* Parker, *supra*, at 737 & n. 110. Although the opinion was criticized on many grounds, the primary concern of most commentators seems to have been the heavy burden of proof that plaintiffs proceeding under the fifteenth amendment or section 2 of the 1965 Act would have to carry. *See, e.g., id.* at 740–46; The Supreme Court, 1979 Term, 94 Harv.L.Rev. 75, 147 (1980). Not only would plaintiffs have to pierce the neutral statements made by legislators, but they would also have to discern the hidden intent of legislators long dead.

In 1982, several provisions of the 1965 Act were due to expire, and Congress, in response to the outcry against *Bolden*, took the opportunity to overturn the *Bolden* plurality's holding that section 2 simply restated the fifteenth amendment. While Congress could do nothing to the plurality's holding that the fifteenth amendment required proof of legislative intent, Congress believed it could do something to section 2 of the 1965 Act. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 41, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 219.[4]

Thus, on April 7, 1981, a new chapter in the story of section 2 opened when several representatives introduced a bill that contained a key amendment to section 2. That bill provided as follows:

> Section 2 of the Voting Rights Act of 1965 is amended by striking out "to deny or abridge" and inserting in lieu thereof "in a manner which results in a denial or abridgement of" and is further amended by adding at the end of the section the following sentence: "The fact that members of a minority group have not been elected in numbers equal to the group's proportion of the population shall not, in and of itself, constitute a violation of this section.".

H.R. 3112, 97th Cong., 1st Sess. § 2, 127 Cong.Rec. 6565 (1981). The House Judiciary Committee thought that this amendment would, without creating a right to proportional representation, effectively overturn the *Bolden* plurality's holding that section 2 required proof of legislative or official intent. *See* H.R.Rep. No. 227, 97th Cong., 1st Sess. 2 (1981). The House Judiciary Committee perceived the amendment as restoring "the pre-*Bolden* understanding of the proper legal standard which focuses on the result and consequences of an allegedly discriminatory voting or electoral practice rather than the intent or motivation behind it." *Id.* at 29–30. Thus, because the amended section would strike down schemes that "are imposed or applied in a manner which accomplishes a discriminatory result," *id.* at 30, the plaintiff could win under section 2

---

**4.** *See also* 128 Cong.Rec. 14,115 (1982) (remarks of Sen. Mathias) (amendment to section 2 not an attempt to overrule Supreme Court's interpretation of Constitution).

merely "by showing the discriminatory effect," *id.* at 29. The House Judiciary Committee then listed several objective factors, drawn from the *White* and *Zimmer* opinions, that could be used to prove the discriminatory "result" or "effect." *Id.* at 30. With these statements, the House Judiciary Committee introduced a most troublesome oxymoron that I discuss below in detail: "discriminatory result."

### 1. *The Subcommittee on the Constitution*

The House of Representatives passed the bill by an overwhelming majority on October 5, 1981. H.R. 3112 was then introduced into the Senate on December 16, 1981, *see* 127 Cong.Rec. at 32,156, and was referred to the Subcommittee on the Constitution of the Senate Judiciary Committee. The Subcommittee did not greet the bill enthusiastically—it was not persuaded by the House Judiciary Committee's assurances that the amendment created no right to proportional representation, nor was it persuaded by the overwhelming vote in the House. *See* Subcomm. on the Constitution of the Senate Comm. on the Judiciary, Voting Rights Act: Report of the Subcommittee on the Constitution [hereinafter Subcommittee Report] ("Given the environment of the House consideration of H.R. 3112, this subcommittee is not persuaded that special deference ought to be accorded the outcome of that consideration."), *appended to* S.Rep. No. 417, *supra*, at 107, 126, *reprinted in* 1982 U.S.Code Cong. & Admin.News 278, 298.

The Subcommittee gave several reasons for fearing that the amendment would result in proportional representation. The Subcommittee argued that the new "results test" provided no ultimate or threshold criterion with which a court could evaluate the evidence before it. Therefore, the Subcommittee believed that evidence of lack of proportional representation combined with evidence of only one objective factor would satisfy the results test; since every challenged district was bound to exhibit at least one objective factor, the results test would "boil[ ] down to ... proportional representation." *See id.* at 136–37, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 308–09. According to the Subcommittee, "[g]iven the lack of proportional representation, as well as the existence of a single one of the countless 'objective factors of discrimination,' the subcommittee believes not only that a prima facie case of discrimination would be established under the results test but that an irrebuttable case would be established." *Id.* at 137, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 309.

In essence, the Subcommittee was looking for a bottom line to the results test: if the objective factors were required to prove only the existence of discriminatory results or effects—terms for which no logical definition could be found—then the test became a strange tautology, and evidence of only one objective factor would be sufficient to surmount the nonexistent threshold. If, however, the results test was given a "core value," that is, if Congress admitted that the test was intended to prevent invidious discrimination in voting systems, then the defendant could overcome the plaintiff's evidence with evidence that invidious discrimination was not present. *See id.* at 137, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 309.

Consequently, the Subcommittee believed that the provision in the amendment that disclaimed any right to proportional representation was meaningless since any substantial minority population that was not proportionately represented would win under the new test. *Id.* at 143–45, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 315–17. In light of these concerns, the Subcommittee recommended to the full Judiciary Committee that section 2 not be amended. *See id.* at 173, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 346.

### 2. *The Senate Judiciary Committee*

It was apparent that H.R. 3112, as written, might not receive enough votes from the Judiciary Committee to be reported to

the full Senate.[5] A compromise position was required—one that would overturn the *Bolden* decision but that definitely would not mandate proportional representation. At this point, Senator Dole proposed language, known as the Dole Compromise, that was eventually enacted as amended section 2. The new language provided as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

S.1992, 97th Cong., 2d Sess. § 2 (1982). Thus, subsection (a) retained the language of the House bill, and subsection (b) incorporated the *White–Zimmer* test as the standard, or core value, of subsection (a)'s new results test.

The report issued by the full Judiciary Committee stated that the compromise language was intended to codify *White, see* S.Rep. No. 417, *supra,* at 2, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 179,[6] and nothing in the report indicates that the Judiciary Committee's interpretation of *White* differs from my interpretation of that case, *see supra* at 1023–26. Therefore, amended section 2 was intended to restore the invidious discrimination requirement as articulated by the *Whitcomb* and *White* Courts: a plaintiff must prove either (1) the subjective discriminatory motive of the legislators or officials, or (2) the existence of objective factors,[7] showing that the electoral scheme interacted with racial bias in the community and allowed that bias to dilute the minorities' voting strength. I turn now to an examination of the report to show that this indeed was the Committee's intent.

As I note above, after *Whitcomb* and *White,* a plaintiff could win a voting rights claim either with proof of legislative intent or with circumstantial evidence of an interaction between racial bias in the community and the challenged scheme. The *Bolden* plurality accepted only the former method

---

5. *See* 128 Cong.Rec. at 14,132 (remarks of Sen. Dole).

6. *See also* 128 Cong.Rec. at 14,132 (remarks of Sen. Dole) ("the new subsection codifies the legal standard articulated in White against Regester"); *id.* at 14,157 (remarks of Sen. Kennedy) ("We have indicated that [the proper legal standard] is the White against Regester test.").

7. The Committee report enumerated nine relevant factors:
   1. history of official discrimination,
   2. racially polarized voting,
   3. use of large districts, majority vote requirements, anti-single shot provisions, or other schemes that enhance the opportunity for discrimination,
   4. denial of minority group's access to slating process,
   5. lingering effects of past discrimination,
   6. use of racial appeals in political campaigns,
   7. extent to which members of the minority group have been elected to public office,
   8. lack of responsiveness on the part of elected officials to the minority group's needs, and
   9. whether the purported state policy underlying the scheme is tenuous.

   *See* S.Rep. No. 417, *supra,* at 28–29, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 206–07.

   The Committee noted that this was not intended to be an exclusive list and that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *See id.* at 29, *reprinted in* 1982 U.S.Code Cong. & Admin. News at 207.

of establishing a voting rights claim under the fifteenth amendment or section 2 of the 1965 Act. The Judiciary Committee's report is abundantly clear that amended section 2 restored the standard under that section to the status quo ante, eliminating only the absolute requirement that plaintiffs prove a discriminatory intent on the part of the legislators or officials responsible for designing or maintaining the challenged scheme. For example, the report stated that "what motives were in *an official's mind 100 years ago* is of the most limited relevance." *Id.* at 36 (emphasis added), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 214. It goes on to note that

> [t]he inherent danger in exclusive reliance on proof of motivation lies not only in the difficulties of plaintiff establishing a prima facie case of discrimination, but also in the fact that the defendants can attempt to rebut that circumstantial evidence by planting a false trail of direct evidence in the form of *official resolutions, sponsorship statements and other legislative history* eschewing any racial motive, and advancing other governmental objectives.

*Id.* at 37 (emphasis added), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 215.

The report is replete with statements such as these. *See, e.g., id.* at 27 (no need to prove discriminatory purpose in enacting or maintaining scheme), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 205.[8] And, in explaining the holdings of *White* and *Whitcomb,* the Committee stated that in neither case "did the Supreme Court undertake a factual examination of the intent motivating *those who designed the electoral districts at issue.*" *Id.* at 22 (emphasis added), *reprinted in* 1982 U.S. Code Cong. & Admin.News at 200.

In light of the Committee's express intention to overturn the *Bolden* legislative intent requirement, the many references to "intent," "motivation," and "purpose"

throughout the report must be taken to refer to the intent, motivation, or purpose of those responsible for enacting or maintaining the challenged scheme. I submit, however, that the Committee intended to retain the invidious discrimination requirement, as articulated by *Whitcomb* and *White* and as I describe above. This means that, even if the plaintiff relies on the objective factors (or, in the report's terminology, the totality of the circumstances), those factors or circumstances, taken as a whole, *must show that the voting community is driven by racial bias and that the challenged scheme allows that bias to dilute the minority population's voting strength.* The Judiciary Committee in its report supports this conclusion in three ways: (1) by incorporating the *Whitcomb–White–Zimmer* standard into section 2; (2) by expressly recognizing the need to prove racial bias in the community; and (3) by using the phrase "discriminatory result."

First, the Committee repeatedly stated that the amendment incorporates the pre-*Bolden* standard, which, of course, is the *Whitcomb–White–Zimmer* standard. *See, e.g., id.* at 16, 27–28, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 193, 204–05. The Committee paraphrased that standard when it noted that "[p]laintiffs must either prove [legislative] intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." *Id.* at 27, *reprinted in* 1982 U.S.Code & Admin.News at 205. The "equal access" language, which formed the basis of subsection 2(b), was drawn from *Whitcomb,* 403 U.S. at 149, 91 S.Ct. at 1872, and *White,* 412 U.S. at 766, 93 S.Ct. at 2339. As I explain above, the opportunity, or lack of opportunity, to participate in the political process was proven in *Whitcomb* and *White* with objective factors indicating that the voting scheme, "overlaid, as it was, on the cultural and economic realities of the

---

**8.** *See also* 128 Cong.Rec. at 13,673 (remarks of Sen. Specter) (proving subjective intent of legislature too difficult); *id.* at 14,113 (remarks of

Sen. Mathias) (*Bolden* test requires inquiry into motives of "public officials" or "lawmakers").

[minority population] and its relationship with the rest of the [voting community]" either did or did not close the political process to the minority group. *See White*, 412 U.S. at 769, 93 S.Ct. at 2341. In other words, the objective factors show whether the voting community as a whole is driven by racial bias and whether the scheme allows that bias to operate to dilute the minority group's voting strength.

Second, the Judiciary Committee explicitly recognized the need to prove this interaction between the challenged scheme and racial bias in the community. Discussing the *Whitcomb–White–Zimmer* test, the Committee stated that under this test, "the court[s] distinguished between situations in which *racial politics* play an excessive role *in the electoral process, and communities in which they do not.*" S.Rep. No. 417, *supra*, at 33 (emphasis added), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 211. The Committee then stated that "there still are some communities in our Nation where racial politics do dominate the electoral process. In the context of *such racial bloc voting, and other factors*, a particular election method can deny minority voters equal opportunity to participate meaningfully in elections." *Id.* (emphasis added), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 211. Clearly, the Committee was concerned about racial politics in the voting community and viewed the objective factors—particularly racial bloc voting—as signs of such racial bias. Furthermore, the Committee defined "opportunity to participate" in terms of the existence, or nonexistence, of racial politics in the voting community.

Third, I submit that the Committee, simply by using the troublesome phrase "discriminatory result," *see, e.g., id.* at 22, 28, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 200, 206,[9] expressed its intent to retain the requirement that the objective factors show an interaction between racial bias in the community and the challenged

scheme. This language paraphrases subsection 2(a)'s language: "which results in a denial or abridgement of the right ... to vote on account of race or color." Professor Blumstein has suggested that the concept of a discriminatory result is "not only anomalous but also analytically bankrupt." Blumstein, *supra*, at 634; *see* Note, Geometry and Geography: Racial Gerrymandering and the Voting Rights Act, 94 Yale L.J. 189, 190 (1984) (meaning of these words not immediately apparent). I think the phrase is significant, however, and a close examination provides important insights into what the Committee intended the amendment to accomplish.

The idea of prohibiting discriminatory results can be better stated as follows: the scheme violates section 2 if it results in discrimination.[10] To understand this statement, consider what else the Committee could have said. It could have said: the scheme violates section 2 if it resulted *from* discrimination. This, of course, is the *Bolden* test rejected by the Committee. Or, it could have said: the scheme violates section 2 if it results in *disproportionate* outcomes. Such a test would have required inquiry only into numbers and geography, creating a right to proportional representation. This the Committee also forcefully rejected. Instead, the Committee intended to prohibit schemes that result in *discrimination.*

The term "discrimination" is not meaningless. The dictionary defines the term rather broadly as "the making or perceiving of a distinction or difference." Webster's Third New International Dictionary 648 (1961). In the context of the Civil War amendments and statutes enacted to enforce those amendments, the term historically has carried a much narrower definition: a classification, decision, or practice that depends on race or ethnic origin. *See* Brest, Foreword: In Defense of the Antidiscrimination Principle, 90 Harv.L.Rev. 1,

---

9. *See also* H.R.Rep. No. 227, *supra*, at 28, 29.

10. In fact, the idea was expressed this way several times. *See, e.g.,* S.Rep. No. 417, *supra*, at 2 (section 2 prohibits any "voting practice, or procedure [that] results in discrimination"); 128

Cong.Rec. at 14,111 (section 2 prohibits "any voting practice or procedure which results in voting discrimination") (remarks of Sen. Mathias, a co-sponsor of the amendment).

1 (1976); *see also Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Strauder v. West Virginia,* 100 U.S. 303, 306, 25 L.Ed. 664 (1879). Thus, the Committee's desire to prohibit discriminatory results can be expressed as an intent to prohibit schemes that result in classifications, decisions, or practices that depend on race or origin. Yet a scheme results in such classifications, decisions, or practices only when there is a conjunction in the political process of two things: (1) a voting scheme or process that allows racial bias to be expressed and (2) racial bias in the voting community. If only the suspect scheme is present, without bias in the community, the scheme cannot, by definition, result in classifications, decisions, or practices based on race or color. Similarly, if only the bias is present, but the scheme does not allow that bias to be expressed or to work to dilute the minority voting strength, then there is simply no reason for the voting community to make classifications, decisions, or practices based on race or color.

We can see, then, by expanding the frequently used phrase "discriminatory result," that the Committee must have intended to prohibit those schemes that result in discrimination; that is, those schemes that work in conjunction with racial bias in the community to allow classifications or decisions based on race or color to dilute the minority group's voting strength, thereby denying that group meaningful access to the political process. As one student commentator, interpreting the phrase "discriminatory results," has argued, "Congress ... revised section 2 to prohibit election practices that accommodate or amplify the effect that private discrimination has in the voting process." Recent Development, Section 2 of the Voting Rights Act: An Approach to the Results Test, 39 Vand.L.Rev. 139, 172 (1986). To reiterate, "discriminatory result," or "effect," implies the existence of two things: a suspect scheme and racial bias in the voting community. If the phrase means anything less, then it truly is "analytically bankrupt."

### 3. *Meaning of the Legislative History*

Prior to *Bolden,* in order to win a voting rights case, a plaintiff had to prove invidious discrimination. This could be done one of two ways. First, the plaintiff could offer proof of the legislators' or officials' subjective discriminatory intent in designing or maintaining the challenged scheme. Second, the plaintiff could offer evidence of objective factors that showed an interaction between the challenged scheme and racial bias in the community. The *Bolden* plurality held that the plaintiff could win under section 2 and the fifteenth amendment only with the first type of proof. The legislative history indicates that section 2 was intended only to overturn the *Bolden* plurality's holding with respect to section 2 and to return voting rights cases under that section to the status quo ante. *See Whitfield v. Democratic Party,* 890 F.2d 1423, 1429 (8th Cir.1989). Thus, the invidious discrimination requirement, as well as the two methods of proving it, remained part of section 2.

### II. *Thornburg v. Gingles*

The Supreme Court's first, and to date only, opportunity to consider amended section 2 came in 1986 in the case of *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Gingles* involved a challenge under section 2 to certain multimember districts in North Carolina. The Court made many important points in *Gingles,* but the most significant holding to emerge from the opinion is the three-part test discussed by Judge Kravitch today, *ante* at 1016–1020. Looking at the objective factors articulated by the Senate Judiciary Committee report, the Court held that "some Senate Report factors are more important to multimember-district vote dilution claims than others." *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. The Court then held that three objective factors must be present to make out a claim of vote dilution caused by a multimember-district scheme: (1) the minority group must be sufficiently large and compact to constitute a majority in a single-

member district; (2) the minority group must be politically cohesive; and (3) the white majority must vote sufficiently as a block normally to defeat the minority group's choice of candidates. *Id.* at 50–51, 106 S.Ct. at 2766–67. In a footnote, the Court stated that if these three factors are present, then the other objective factors normally included in the totality-of-the-circumstance test, "are supportive of, but *not essential to,* a minority voter's claim." *Id.* at 48 n. 15, 106 S.Ct. at 2765 n. 15.

Initially, this rather mechanical interpretation of section 2 appears to be directly contrary to the Senate Judiciary Committee's intent that the totality-of-the-circumstances test be a flexible one. Judge Kravitch today, in fact, seems to read the *Gingles* opinion as articulating a completely mechanical test: if plaintiff shows X, Y, and Z, then plaintiff *must* win. If that is Judge Kravitch's position, then she misreads *Gingles* and significantly departs from the intent of Congress in enacting amended section 2. Before examining *Gingles* in more detail, I return briefly to the debate over section 2 in the Senate and its Judiciary Committee.

As I note earlier, the primary objection in the Subcommittee on the Constitution to the House bill was the perceived lack of a threshold requirement to the results test. Without such a requirement, the Subcommittee members feared, a plaintiff could mechanically prove one objective factor and win under the new language, not leaving the defendant any opportunity to rebut the plaintiff's case. *See* Subcommittee Report, *supra,* at 137, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 309. By allowing the plaintiff to establish an irrebuttable prima facie case with proof of only one factor, then any substantial minority population would have a de facto right to proportional representation.

To allay these fears, Senator Dole proposed language that would expressly incorporate the *totality* of the circumstances

test. *See* 128 Cong.Rec. at 14,132 (remarks of Sen. Dole). The Judiciary Committee report clearly stated that this was not a mechanical test and that it did not require "that any particular number of factors be proved, or that a majority of them point one way or the other." S.Rep. No. 417, *supra,* at 29, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 207. Obviously, the Committee's intended test would not allow a plaintiff to establish an irrebuttable prima facie case with proof of only one factor.

The Senators certainly intended the test to allow plaintiffs to proffer their evidence of the objective factors and to allow *defendants* to proffer their evidence in rebuttal. *See, e.g., id.* at 29 n. 116, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 207 n. 116 ("[D]efendants' proof of some responsiveness would not negate plaintiff's showing by other, *more objective factors....* However, should plaintiff choose to offer evidence of unresponsiveness, then the defendant could offer rebuttal evidence of its responsiveness." (emphasis added)); 128 Cong.Rec. at 13,673 (remarks of Sen. Specter) ("[T]his is not to say that countervailing governmental purposes and interests cannot be advanced. They, too, may be shown as circumstances to be considered."); 128 Cong.Rec. at 14,136 (remarks of Sen. Heflin) ("The Dole compromise takes into consideration all circumstances *both pro and con....*" (emphasis added)). Not to allow a defendant to rebut a plaintiff's proof of objective factors would simply be inconsistent with the spirit of compromise surrounding the Dole language—it would be inconsistent with the intent of the sponsors of the Dole Compromise to allay the Subcommittee members' fears that a plaintiff could establish an irrebuttable case with proof of only one objective factor.

The only question remaining is what the Senators intended to require a defendant to prove in order to rebut a plaintiff's case.[11] I think that my discussion of the meaning

---

11. If, indeed, Judge Kravitch today would hold that proof of the three *Gingles* factors is not always sufficient to prevail on a section 2 claim,

then this is an important question that she fails to answer.

of incorporating the *Whit-comb–White–Zimmer* test into section 2 demonstrates that the Senators would allow a defendant to rebut successfully a plaintiff's case with affirmative proof of the absence of invidious discrimination in the political process. This means that when a plaintiff relies on *White–Zimmer* objective factors to prove lack of meaningful access to the political process, the defendant can succeed in rebutting the plaintiff with evidence of objective factors proving the absence of an interaction between racial bias in a community and a scheme that allows the bias to dilute the voting strength of the minority group.

The Judiciary Committee addressed this point in its report. The Committee said that

> [t]he results test *makes no assumptions one way or the other* about the role of racial political considerations in a particular community. If plaintiffs assert that they are denied fair access to the political process, in part, because of the racial bloc voting context within which the challenged system works, *they would have to prove it.*

S.Rep. No. 417, *supra,* at 34 (first emphasis in original, second added), *reprinted in* 1982 U.S.Code Cong. & Admin.News at 212. The Committee tells us two things in this rather oblique statement. First, it defines fair access to the political process in terms of the existence or nonexistence of racial bias in the voting community. Second, it says that proof of bloc voting does not mechanically make the plaintiff a winner—the court must be satisfied that racial bias plays a major role in the voting community (i.e., that fair access is denied). If the defendant can affirmatively prove, under the totality of the circumstances, that racial bias does not play a major role in the political community, and the plaintiff cannot overcome that proof, then obviously the Committee did not intend the plaintiff to win, *even if the plaintiff has proven bloc voting.*

With this background in mind, we are ready to tackle *Gingles. Gingles* did not address cases in which plaintiffs attempt to prove the intent of legislators or officials who designed or maintained the challenged scheme; instead it focused on cases in which plaintiffs rely on proof of objective factors. The Court first restated the two requirements of the totality-of-the-circumstances (or, objective factors) test: (1) the existence of a suspect scheme, and (2) the existence of racial bias in the community. The Court said, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure *interacts with social and historical conditions* to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* 478 U.S. at 47, 106 S.Ct. at 2764 (emphasis added).

The Court then discussed the three factors required to state a claim of vote dilution by a scheme of multimember districts: (1) large and compact minority group; (2) politically cohesive minority group; and (3) bloc-voting white majority. The conjunction of these three factors, according to the Court, is a "precondition[ ]" to vote dilution by the challenged scheme. *Id.* at 50, 106 S.Ct. at 2766. If the plaintiff cannot prove those factors, he cannot prove his claim. *Id.* at 48 & n. 15, 106 S.Ct. at 2765 & n. 15. The Court purported to apply the totality-of-the-circumstances test, *see id.* at 46, 106 S.Ct. at 2764, and it approved the district court's "careful consider[ation of] the totality of the circumstances," *see id.* at 80, 106 S.Ct. at 2781. The Court, however, also held that a plaintiff could win with proof of only these three factors; proof of other factors would not be necessary. *Id.* at n. 15, 106 S.Ct. at 2765 n. 15.

It is not immediately apparent how this gloss on the totality-of-the-circumstances test is consistent with the Judiciary Committee's mandate that "[t]he failure of plaintiff to establish any *particular* factor[,] is not rebuttal evidence of non-dilution," *see* S.Rep. No. 417 (emphasis added), *supra,* at 29 n. 118, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 207 n. 118, and that courts not engage in "factor counting," *see id.* at 35, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 212. Indeed, Judge Kravitch's occasionally rigid

interpretation of *Gingles*—which at times seems to treat the three *Gingles* factors as both necessary and *always* sufficient elements of a vote dilution claim—flies in the face of the Committee's mandate.

The *Gingles* Court did not say that a plaintiff who proves the three factors will *invariably* win; it said that the three factors are prerequisites to a successful claim and that they are the "most important" of the factors and are sufficient to make out a claim. *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. But the Court never said that the defendant could not rebut the plaintiff's claim. If the Court meant to deny the defendant an opportunity to rebut the plaintiff's case after the plaintiff has offered evidence of the three factors, then the three factors would be both necessary *and always sufficient* to win under section 2. Such a holding would reject the clear mandate of section 2's language and the Senate Judiciary Committee's report. Moreover, such a holding would render nonsensical the Court's discussion of the totality of the circumstances *after* it had noted the plaintiff's success in proving the three factors, *see id.* at 80, 106 S.Ct. at 2781. The Court's adherence to the totality-of-the-circumstances test *must* mean that the defendant can rebut the plaintiff's claim—even after the plaintiff has offered proof of the three *Gingles* factors.

In summary, *Gingles* stands for the following propositions:

1. If the plaintiff cannot prove (1) the existence of a large and compact minority group, (2) that the group is politically cohesive, and (3) that the white majority typically votes as a block, he cannot make out a claim under section 2.

2. If the plaintiff does prove these three factors, and the defendant offers nothing in rebuttal, the plaintiff wins.

3. If the plaintiff proves the three factors and the defendant offers proof of

other objective factors in rebuttal, the court must be satisfied, before it may rule in favor of the plaintiff, that, under the totality of the circumstances, the minority group is denied meaningful access to the political process "on account of race or color." If the defendant can affirmatively show that the "social and historical conditions" are such that their interaction with the scheme will not result in voting discrimination, *see id.* at 47, 106 S.Ct. at 2764, the plaintiff cannot prevail. *See* S.Rep. No. 417, *supra,* at 34, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 212. Such an affirmative showing can be made with evidence of objective factors that, under the totality of the circumstances, indicate that the voting community is not driven by racial bias.[12]

## III. PULLING IT ALL TOGETHER

The foregoing discussion shows, if nothing else, that the story of section 2 is long, complex, and full of traps for the unwary. One commentator has said that amended section 2 "means all things to all parties [and therefore] means nothing at all." *See* 128 Cong.Rec. 14,131 (1982) (remarks of Sen. East) (quoting *Wall Street Journal* editorial). Although there is some truth to that statement, I believe that enough judicial and legislative history is available to make sense of amended section 2.

After extensively reviewing the language of section 2, the judicial and legislative background of that section, and the Supreme Court's opinion in *Gingles,* I am convinced that a plaintiff must still prove invidious discrimination in order to succeed under section 2. The plaintiff may prove such discrimination by adducing evidence of either (1) the discriminatory intent of the legislators or officials responsible for designing or maintaining the scheme or (2) objective factors that, under the totality of

**12.** I do not mean to imply that a defendant, by proving absence of racial bias, can rebut a plaintiff's showing of racial bloc voting. The *Gingles* Court expressly held that proof of a correlation between the race of voters and the selection of candidates raises an irrebuttable, prima facie case of racial bloc voting. 478 U.S. at 74, 106 S.Ct. at 2778. Such evidence, however, does not create an irrebuttable case of vote dilution—it is irrebuttable proof of only one factor (albeit an important factor) in the totality-of-the-circumstances test.

the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme. Finally, while plaintiffs who satisfy the three *Gingles* factors make out claims under section 2, courts must resort to the totality-of-the-circumstances analysis when the defendant offers evidence of objective factors in rebuttal. As the Judiciary Committee stated, the "ultimate issue to be decided [must be] whether the political processes were equally open." *See* S.Rep. No. 417, *supra*, at 35, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 213. Judge Kravitch, in her special concurrence today, however, might be treating the three *Gingles* factors as the ultimate issues to be decided.[13]

**13.** If this is Judge Kravitch's interpretation of section 2, and if this interpretation is correct, then Congress has done something it most definitely did not intend to do—enact a right to proportional representation. If all a plaintiff must ever do is prove the three *Gingles* factors, then all large, compact, and politically cohesive minority groups will have a de facto right to proportional representation. Whenever minority candidates are not succeeding in at-large elections, and whenever the minority is large and politically cohesive, the *only* explanation for the minority candidates' lack of success would be white bloc voting.

Assume, for example, that a county has a population of 100 people; 70 white and 30 minority. Assume further that the county commission has one vacant seat and that one white candidate and one minority candidate are running for the seat. The minority population is cohesive, and the minority candidate receives 20 minority votes while the white candidate receives only 10 of those votes. In order to win, the white candidate must receive 41 of the 70 white votes, or 59% of the white votes. I submit that if this pattern continued over several elections, most courts would find the pattern to be strong evidence of white bloc voting. *See Gingles,* 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21 (bloc voting occurs when "black voters and white voters vote differently"). When the minority group is large and cohesive, and when the minority candidates consistently fail, the white majority *must* be bloc voting.

Therefore, the three *Gingles* factors collapse into two factors: (1) Is the minority group large and compact, and (2) is it politically cohesive? If Judge Kravitch's rigid interpretation of *Gingles* is correct, then a plaintiff who proves these two factors *must always* win, which means simply that large, compact and cohesive minority

The concepts of guaranteeing access to the political process and guaranteeing representation in proportion to a minority group's percentage of the population are quite distinct. To guarantee the former and not the latter, however, courts must develop a burden of proof for section 2 plaintiffs that is neither too heavy nor too light, and the line between the proper burden and a burden that is either too heavy or too light becomes faint at times. Clearly, Congress' attempt to articulate the correct burden of proof rules out *Bolden's* intent test, and I have not attempted in this opinion to resurrect that standard. Depending upon how one interprets Judge Kravitch's special concurrence, its proposed burden of proof either goes too far in the other direction or is left largely undefined.

groups will possess a de facto right to proportional representation.

While Congress, under the fifteenth amendment, may prohibit certain practices not prohibited by section 1 of the fifteenth amendment, *see City of Rome v. United States,* 446 U.S. 156, 173, 100 S.Ct. 1548, 1559, 64 L.Ed.2d 119 (1980), it may do so only with *appropriate* legislation, *see id.* at 175, 100 S.Ct. at 1560 (quoting *Ex parte Virginia,* 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879)). The Court in *City of Rome* approved only the preclearance provisions of section 5 of the Voting Rights Act, *see supra* at 1022; it said nothing about abolishing section 2's invidious discrimination requirement or about enacting a right to proportional representation. In fact, the Court held that the preclearance provision was appropriate only because "Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the *risk of purposeful discrimination,* it was proper to prohibit changes that have a discriminatory impact." *Id.* 446 U.S. at 177, 100 S.Ct. at 1562 (emphasis added) (footnote omitted).

There has never been any suggestion that legislation granting a right to proportional representation is an appropriate means of enforcing the fifteenth amendment. *Cf.* The Federalist No. 35, at 219–20 (A. Hamilton) (J. Cooke ed. 1961) (proportional representation of "each class" is neither feasible nor desirable). Congress clearly disavowed such a purpose, and I presume that Judge Kravitch would not find such legislation appropriate. Yet, her interpretation of section 2 creates such a right for large, compact, and cohesive minority groups, and such an interpretation makes section 2 plainly inappropriate under *City of Rome* and *Ex parte Virginia.*

I submit that the burden of proof proposed herein is "just right." It does not raise insurmountable hurdles for section 2 plaintiffs; rather, it allows a defendant to rebut a plaintiff's claim when the political processes are not closed to the minority group. Thus, it guarantees equal access to the political processes but does not create a right to proportional representation.

### IV.

Judge Kravitch would hold as a matter of law that the appellants have succeeded in their claim under *Gingles* and section 2. Such a holding would leave the district court with only one task: to fashion an appropriate remedy. As the foregoing discussion has shown, however, Judge Kravitch either (1) incorrectly treats the three *Gingles* factors as the necessary *and* sufficient elements of a section 2 vote dilution claim or (2) fails to articulate how appellants have won under the more flexible totality-of-the-circumstances test. Although proof of the three *Gingles* factors might be sufficient to succeed on a vote dilution claim, the district court still must make its ultimate determination based on the totality of the circumstances. *See Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764. If, in light of the totality of the circumstances, the appellees can show that the voting communities were not driven by racial bias, then the appellants cannot prevail.

Writing for the panel in this case, I noted that the appellants have adduced sufficient evidence to prove that the minority group was large, compact, and politically cohesive and that the voting communities' voting patterns were racially polarized. *See Solomon v. Liberty County*, 865 F.2d 1566, 1574, 1579–81 (11th Cir.1988). I therefore agree with Judge Kravitch's conclusion that the appellants have proven these factors. The panel held, however, that the district court's findings of fact were inadequate on several points, making a final

determination in light of the totality of the circumstances impossible.[14] The panel therefore remanded the case to the district court with instructions to make additional findings of fact. I submit that the panel's disposition of this case was proper and therefore disagree with Judge Kravitch's conclusion that, as a matter of law, the appellants have prevailed.

HILL, Senior Judge:

I concur in the opinion of Chief Judge Tjoflat.

By writing separately, I take no issue with what he has said. In one or two respects, I might approach the subject from a different point of view. It may well not be a better point of view—just one that ought not be overlooked.

Chief Judge Tjoflat has given us the legislative and decisional history of the Voting Rights Act. The Fifteenth Amendment is constitutional; the Voting Rights Act is statutory. Nevertheless as judicial decisions are followed by legislative amendments, their meanings are to be ascertained, in the common law tradition, by inspecting, at each step, what has gone on before and what is accomplished by the step investigated. Chief Judge Tjoflat's opinion is, thus, a significant piece of work in the common law method.

This comes to us from the enactment and promulgation point of view. We understand what the people meant who adopted the Fifteenth Amendment, what the congress did when it passed legislation to implement it; what was held by the judicial branch interpreting the legislation and, therefore, what the legislative branch undertook to do when it amended its earlier work to correct what it perceived its shortcomings to have been as interpreted by the Court.

The history of the Voting Rights Act is also interesting when one reviews its histo-

---

**14.** Specifically, the panel held that the district court's findings of fact were inadequate with regard to (1) whether minorities were excluded from candidate slating processes, (2) whether racial appeals were made during campaigns, (3) whether the elected officials were responsive to

the particular needs of the minority communities, and (4) whether the state's policy behind the challenged electoral system was tenuous. *See Solomon v. Liberty County*, 865 F.2d 1566, 1581–83 (11th Cir.1988).

ry from the point of view of the effect it has had on government and those who govern.

In a democracy, elected office holders tend to advance the interests of their electorate.[1] They have no *political* motivation or pressure to represent other members of the population within their state, district, county or etc. The office holder's official fate is in the hands of those who vote and they can—and, historically do—demand responsiveness.[2]

From shortly after the end of Reconstruction until the enactment of (and enforcement of) the Voting Rights Act, the *electorate* in large parts of the country was made up of white people. Faithfully, office holders represented these people and exerted themselves to obtain governmental responsiveness to their wishes and needs. Governors, Senators, Congressmen, Legislators, Mayors, Councilmen, Commissioners, Sheriffs, and School Board Members had no *political* reason to respond to the needs of black citizens who were not a part of their electorates. Democracy, as far as it went, worked; the people who held the franchise could greatly influence the actions of elected officials.

Democracy, though, did not go far enough. The black people, excluded from membership in the electorate, commanded no more governmental response to their needs than occasional crumbs from the white feast.

The Voting Rights Act—and its rigid enforcement—extended democracy by expanding the electorate of every office holder. Those who had been excluded entered into the "voting community." Because democracy works, governmental action began to change. The response of office holders remained constant; they faithfully represented their electorate. It was the electorate that changed. Governors did not have to learn to count; they merely had to realize that when they had counted the white community, they had not finished counting!

Usually—but not always—the new black members of the electorate constituted a minority. There are those who conclude that office holders need not be politically responsive to a minority. An office holder who believed this was soon replaced by a candidate who was supported by the minority and received a reasonable split of the votes of the majority!

Before the enforcement of the Voting Rights Act's demand that blacks have access to the ballot and the ballot box, there were office holders who would denounce as scurrilous slander an opponent's suggestion that the office holder had attended a black gathering. A familiar political trick was to print a picture of a black church meeting, dinner or other gathering with a political opponent's picture cleverly inserted making it appear that the opponent had attended. Since the electorate changed, *those same office holders* have vied for invitations to such meetings and attend to make their responsiveness to the needs of black citizens apparent.

The judiciary has embarked on a massive campaign to undo these great and good changes in our political institutions. Where there are black voters and white voters in one political system, the courts are limiting the impact of black votes so that it falls on only one or two, generally a minority, of the office holders. By gerrymandering district lines so as to encircle the black voters, blacks are prevented from being a part of the separate electorates of, usually, a majority of those to be elected. Once again, as in days before the Voting Rights Act, most office holders have *political* reason to respond to the wishes and needs of white citizens and need not concern themselves with the blacks. Those who have heretofore responded to—and

---

1. Chief Judge Tjoflat uses the expression "voting community" as distinguished from the community as a whole. I intend the word "electorate" to convey the same.

2. I do not overlook the fact that there are and have been office holders who conscientiously seek the welfare of all, whether members of the electorate or not. Neither do I mean to ignore others who would *prefer* to discriminate against substantial minorities who *do* vote. Our democratic form of government does not depend entirely upon the *noblesse oblige* of the former and it is not at the mercy of the latter.

been supported by—black citizens have their support taken away, and they fall victim to the campaign of a closet segregationist who has found it politically expedient to come out of the closet.

Where, on one board, council or commission, an issue arises with racial overtones, the members with white constituencies have no political reason to seek a middle ground and those whose electorate is black are politically compelled to resist compromise—to resist being seen as Uncle Tom. Polarization is not tempered by the new political arrangement; it is compelled by it.

In Liberty County, today, *every* county commissioner and school board member knows that he or she has a constituency with 11% black voters. To ignore them or their wishes and needs is to present a potential challenger with 11% of the votes in hand. In any close division of white votes, that 11% could defeat the office holder.

Those who join Judge Kravitch's opinion would relieve these commissioners and board members of this concern. Judge Kravitch's opinion would make it necessary that *one* commissioner and *one* member of the school board pay attention to the citizens of the county who are black. The other majority commissioners and school board members would be, politically, the same as if the Voting Rights Act had never become law. They could still count and, once again, when they had counted the white voters they would have finished counting. Requiring the creation of a separate district for black voters would forbid the black citizens of Liberty County from voting for or against the vast majority of office holders. The once genuine fears of "white supremacists" that blacks were going to have an impact upon elected officials would be largely allayed.

Is it necessary that such a result ever be brought about? I acknowledge that *Thornburg v. Gingles,* 478 U.S. 30, 84, 106 S.Ct. 2752, 2784, 92 L.Ed.2d 25 (1986), says that in some cases of manipulation of area-wide voting practices for racial purposes it may be necessary. I agree with Chief Judge Tjoflat that *Gingles* does not say that it should be done if it can be done; I read Judge Kravitch's opinion as *requiring* one or more separate districts into which black voters shall be confined whenever that arrangement is found feasible.

For these reasons stated in this *en banc* case, and those I expressed in the panel decisions in *U.S. v. Dallas County Commission, Dallas County, Alabama,* 850 F.2d 1433, 1443 (11th Cir.1988) (Hill, J. specially concurring); *Edge v. Sumter County School District,* 775 F.2d 1509, 1514 (11th Cir.1985) (Hill, J. specially concurring); *Lee County Branch of the NAACP v. City of Opelika,* 748 F.2d 1473, 1484 (11th Cir. 1984) (Hill, J. specially concurring) and *Kirksey v. Board of Supervisors of Hinds County, Miss.,* 554 F.2d 139, 159 (5th Cir. 1977) (Hill, J. dissenting) and for the reasons given by Chief Judge Tjoflat, I join in his opinion.